United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIFONE, INC., | No. C 04-02795 WHA |
| Plaintiff, | Consolidated with |
| v. | No. C 04-04025 WHA and<br>No. C 05-00465 WHA |
| VERVE, LLC., OMRON CORPORATION, OMRON MANAGEMENT CENTER OF AMERICA, INC., OMRON ADVANCED SYSTEMS, INC., OMRON LOGISTICS OF AMERICA, INC., OMRON ELECTRONICS, INC., OMRON IDM CONTROLS, INC., OMRON MANUFACTURING OF AMERICA, INC., OMRON SYSTEMS LLC, OMRON TRANSACTION SYSTEMS, INC., and OMRON ELECTRONIC COMPONENTS LLC, | **ORDER DENYING MOTION TO DISMISS CLAIMS AGAINST OMRON DEFENDANTS AND VACATING HEARING** |
| Defendants. | |
| AND CONSOLIDATED CASES. | |

## INTRODUCTION

In this consolidated patent case, plaintiff seeks a declaratory judgment of patent invalidity, unenforceability and non-infringement of United States Patent Nos. 4,562,341 ("the '341 patent") and 4,678,895 ("the '895 patent").[*] Defendants move to dismiss all claims against Omron Corporation and its subsidiaries (collectively "Omron"). Because this order finds that Omron has standing to join Verve in suing for patent infringement, this motion is **DENIED**.

---

[*] Plaintiff's claims regarding United States Patent No. 4,562,340 have been dismissed.

**STATEMENT**

Defendant Verve, LLC is the current assignee of the patents-in-suit. It acquired the '341 patent and the '895 patent (among others) from Omron. Plaintiff Verifone, Inc., however, alleges that Omron retained significant rights, such that Verve's ownership is merely nominal (Compl. ¶ 24). The parties agree that the key question in determining whether Omron was appropriately joined in this action is whether it has standing to sue for patent infringement.

The '895 patent was assigned on August 15, 2003, via Patent Assignment Agreement No. 081303 (Irmscher Exh. B). Therein, Section 2.1 granted Verve "all of Omron's right, title and interest in the Patents, including any and all accrued causes of action for damages for infringement thereof," meaning Verve "in its sole discretion" could take all actions that it deemed necessary or proper to collect, assert or enforce the patents (*id.* at 2). Meanwhile, Section 2.3 granted Omron "a non-exclusive, worldwide, irrevocable, perpetual, royalty-free, fully paid-up, license under the Patents to reproduce, make, have made, use, import, offer for sale, and sell any products or services" (*ibid.*). Section 3.2 further provided that Verve would "use its best efforts to maximize the Collected Licensing Revenue generated from the Patents" and pay Omron according to the formula outlined in Section 3.1 (*id.* at 3). The '341 patent was assigned (with substantially similar terms) on October 14, 2003, via Patent Assignment Agreement No. 101403 (Irmscher Exh. C).

Both of these agreements were superseded on March 19, 2004, by Patent Assignment and License Agreement No. 031804 (Irmscher Exh. D). This agreement covered eleven ASSIGNED PATENTS, nine LICENSED PATENTS, and four PREVIOUSLY ASSIGNED PATENTS, including the two patents-in-suit. Section 2.4 noted that the prior assignment of "the PREVIOUSLY ASSIGNED PATENTS including any and all accrued causes of action for past, present and future infringement," was not altered other than as set forth elsewhere in the agreement (*id.* at 4). Section 6.1 provided that to the extent they were inconsistent with any prior agreements between Verve and Omron, the terms of Agreement No. 031804 would control (*id.* at 7–8). For example, under the new payment schedule, Omron received a greater percentage of the licensing revenue than described in the previous agreements (*id.* at 5).

2

The most relevant provisions of this agreement are replicated below (*id.* at 4–5):

    3.1 <u>License to OMRON.</u>  Upon execution of the assignment document, VERVE grants to OMRON a non-exclusive, worldwide, irrevocable, sub-licensable, perpetual, royalty-free, fully paid-up, license under the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS to reproduce, make, have made, use, import, offer for sale, and sell any products or services.  VERVE understands that OMRON's license to the ASSIGNED PATENTS, LICENSED PATENTS, and PREVIOUSLY ASSIGNED PATENTS extends to OMRON's present customers and clients for the products and services they receive from OMRON.

    3.2 <u>Right to Sub-License and Cross-License.</u>  Under OMRON's license defined in Section 3.1 above, OMRON is granted the right to sub-license and cross-license the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS to OMRON's present and future business partners and customers.  This right is waived with respect to parties for which OMRON has already been provided the opportunity to determine whether certain potential licensees or parties were a present customer or client of OMRON and that VERVE has already filed suit against subject to Section 3.4.

    3.3 <u>Right to Assert.</u>  Upon execution of the assignment document, VERVE grants to OMRON the right to have VERVE assert the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS on OMRON's behalf in any litigation brought against OMRON.  The decision to assert the PATENTS and PREVIOUSLY ASSIGNED PATENTS on OMRON's behalf shall be made by OMRON in its sole and absolute discretion.  OMRON shall be responsible for all costs and expenses incurred in having the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS asserted on its behalf.

    3.3.1  OMRON shall be entitled to sixty percent (60%) of all revenues and/or other monetary benefits which OMRON may obtain from having the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS asserted on its behalf.  OMRON shall be entitled to one-hundred percent (100%) of all non-monetary benefits (e.g. non-monetary cross-licenses, non-monetary distributor agreements or other non-monetary business deals).

    3.4 <u>Right to Notice.</u>  VERVE agrees to notify OMRON of any potential licensee which VERVE intends to contact, notice or file suit against based on the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS <u>prior</u> to VERVE contacting, notifying, or filing suit against any potential licensee.  OMRON and VERVE agree and understand that prior to the effective date of this Agreement, VERVE has already provided OMRON the opportunity to determine whether certain potential licensees or parties were a present customer or client of OMRON and that VERVE has already contacted, notified or filed suit against such certain potential licensees or parties.  VERVE further agrees to allow OMRON the opportunity to first determine within thirty (30) days after VERVE notifies OMRON whether a potential licensee is a present customer or client of OMRON prior to VERVE contacting, notifying, or filing suit against that potential licensee.

Shortly thereafter, on April 1, 2004, the parties supplemented Agreement No. 031804 with Addendum 1-033004. Therein, Omron's right to sub-license and cross-license patents was amended as follows (*id.* at 10):

> 1.0 <u>Right to Sub-License and Cross-License.</u>  Under OMRON's license defined in Section 3.1 of the AGREEMENT, OMRON is granted the right to sub-license and cross-license the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS to OMRON's present and future business partners and customers as OMRON determines and sees fit.
>
> 2.0  Notwithstanding Sections 3.2 and 3.4 of the AGREEMENT, OMRON's right to sub-license and cross-license applies also to those parties who are initially approved by OMRON under Section 3.4, as well as those parties against whom VERVE has already filed suit.
>
> 3.0 <u>Reimbursement to Verve.</u>  Where OMRON grants a license to a party against whom VERVE has already filed suit, OMRON agrees to reimburse VERVE for all of its reasonable third-party attorney fees, out-of-pocket costs and expert witness fees which VERVE has incurred in its attempts to obtain COLLECTED LICENSING REVENUE from the licensed party. For all such reimbursements, VERVE must provide OMRON with a detailed report within thirty (30) days of any deductions or reimbursements being made.

The addendum further described certain limitations on Omron's reimbursement of litigation costs if it granted a license to a party against whom Verve had already filed suit (*id.* at 10–11).

## ANALYSIS

**1.    LEGAL STANDARD.**

On a motion to dismiss for lack of subject-matter jurisdiction, the Court may hear evidence and make findings of fact necessary to rule on the jurisdictional question, if the jurisdictional facts are not intertwined with the merits. In such cases, there is no presumption that the facts alleged in the complaint are true. But, if the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the motion to dismiss for lack of jurisdiction is treated like a summary judgment motion and should only be granted if the moving party is entitled to prevail as a matter of law. Otherwise, the intertwined jurisdictional facts must be resolved by the trier of fact. *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1990)(internal citations omitted).

Here, the question of whether Omron as standing to sue for patent infringement, (by itself, with the patentee or in the name of the patentee), is independent from the questions of

1 infringement or validity of the patents-in-suit. Because the jurisdictional facts are not
2 intertwined with the merits, this order may make findings as necessary to rule on the motion.

### 2. STANDING.

Only a "patentee" can bring an action for patent infringement. 35 U.S.C. 281. A "patentee" is defined as the party to whom the patent issued or any successors in title to the patent. 35 U.S.C. 100(d). "Where a patentee makes an assignment of all significant rights under the patent, such assignee may be deemed the effective 'patentee' under the statute and has standing to bring suit in its own name for infringement." *Ortho Pharmaceutical Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995). In contrast, "[a] licensee is not entitled to bring suit in his own name as a patentee, unless the licensee holds 'all substantial rights' under the patent." *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998)(internal citations omitted). Otherwise, an exclusive licensee has standing to sue third parties "if at all, only with the patentee or in the name of the patentee." *Ortho*, 52 F.3d at 1030. Meanwhile, the holder of a non-exclusive or "bare" license — *i.e.*, no more than a simple covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities — "suffers no legal injury from infringement, and thus, has no standing to bring suit or even join in a suit with the patentee." *Id.* at 1031.

Verifone's argument is twofold. First, it argues that Omron failed to successfully assign the patents to Verve because it retained significant rights in a simultaneous transaction. In the alternative, it argues that if the assignment was valid, the subsequent licensing of substantial rights to Omron was sufficient to confer standing to sue. This order is not persuaded by the first argument, but agrees with the second. Under the assignment agreements summarized above, Verve is the current assignee of the patents-in-suit. That certain rights were simultaneously "licensed back" to Omron does not invalidate the initial assignment. *Littlefield v. Perry*, 88 U.S. 205, 221–22 (1874). The question, then, is the effect of the license.

Omron argues that as a non-exclusive licensee of the patents-in-suit, it lacks standing to prosecute infringement claims. Verifone counters that Omron was licensed substantial rights in

1  the patents under the assignment agreements, such that it is a party in interest to this litigation.
2  The Court agrees that Omron possesses a significant number of proprietary "sticks" in the
3  so-called "bundle" of patent rights.
4       While it is true that a non-exclusive licensee lacks standing to sue, this order rejects
5  Omron's characterization of its license as non-exclusive. Even the decision cited by Omron on
6  this point recognizes that it is a "bare" licensee that has no standing to sue. *Intellectual*
7  *Property Dev., Inc. v. TCI Cablevision of Calif., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). An
8  exclusive licensee receives more substantial rights in a patent than a non-exclusive (or "bare")
9  licensee, but fewer than an outright assignment. *Ibid.* Omron stresses that Agreement
10 Nos. 081303, 101403 and 031804 all explicitly defined the license as non-exclusive.
11 Notwithstanding the wording of the agreements, this order finds that Omron was granted much
12 more than a mere covenant not to be sued for practicing the patented invention. *See Ortho*, 52
13 F.3d at 1032 ("[I]t is the licensee's beneficial ownership of a right to prevent others from
14 making, using or selling the patented technology that provides the foundation for co-plaintiff
15 standing, not simply that the word 'exclusive' may or may not appear in the license.").
16      Not only were Omron and its subsidiaries protected from suit, but Verve's covenant not
17 to sue extended to Omron's customers and clients. Importantly, Omron was also granted the
18 right to sub-license or cross-license with "present and future business partners and customers"
19 as it saw fit. *Compare Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310, 1313–14
20 (Fed. Cir. 2005)(finding that the licensee had constitutional standing when it "had certain
21 significant rights to the patent, in particular, the right to make, use, and sell the patented
22 [invention], as well as the right to grant sub-licenses).
23      The significance of this right is underscored by the fact that a sub-license from Omron
24 effectively terminates *Verve's* right to take any actions to assert the patent itself. For example,
25 Verve must provide thirty days notice before contacting, notifying or filing suit against any
26 potential licensee in order to allow Omron the opportunity to determine whether a particular
27 entity is a present customer or client. Implicit in this requirement is an understanding that if the
28 answer is in the affirmative, Verve will refrain from its intended action. Likewise, the provision

1  pertaining to Omron's obligation to reimburse Verve for any litigation costs reported within
2  thirty days only makes sense if the pending lawsuit between Verve and the third party ended
3  when Omron granted that third party a license. Thus, Verve and Omron clearly intended to
4  share the exclusive right to license the patents between them, in the sense that a license from
5  *either* would function as a covenant not to sue from *both*. Indeed, any other arrangement would
6  be virtually worthless to the sub-licensee. This hardly qualifies as a "bare" license.

7  Because Verve is also a party to this action, the Court need not decide whether Omron
8  has sufficient standing to sue by itself. If nothing else, Omron has standing to bring an
9  infringement suit as a co-plaintiff with or through Verve. Section 3.3 of Agreement No. 031804
10 even explicitly recognized Omron's right to enforce the patents, at least whenever, like here,
11 litigation is brought against it.

## CONCLUSION

13 For the foregoing reasons, this order finds, at least on the record currently before the
14 Court on this motion to dismiss, that Omron *does* have standing to sue for patent infringement.
15 Accordingly, defendants' motion is **DENIED**. The hearing on this motion, currently scheduled
16 for **MAY 26, 2005 AT 8:00 A.M.**, is **VACATED**. In light of this ruling, specific discovery
17 concerning jurisdictional facts is unnecessary and Verifone's request to conduct such discovery
18 is **DENIED**.

20 **IT IS SO ORDERED.**

22 Dated: May 13, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

7