IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIFONE, INC., | No. C 04-02795 WHA |
| Plaintiff, | Consolidated with |
| v. | No. C 04-04025 WHA and<br>No. C 05-00465 WHA |
| VERVE, LLC., OMRON CORPORATION, OMRON MANAGEMENT CENTER OF AMERICA, INC., OMRON ADVANCED SYSTEMS, INC., OMRON LOGISTICS OF AMERICA, INC., OMRON ELECTRONICS, INC., OMRON IDM CONTROLS, INC., OMRON MANUFACTURING OF AMERICA, INC., OMRON SYSTEMS LLC, OMRON TRANSACTION SYSTEMS, INC., and OMRON ELECTRONIC COMPONENTS LLC, | **CLAIM-CONSTRUCTION ORDER** |
| Defendants. / | |
| AND CONSOLIDATED CASES. / | |

**INTRODUCTION**

This is the claim-construction order for United States Patent Nos. 4,562,341 ("the '341 patent") and 4,678,895 ("the '895 patent"). The following claim terms are construed herein: (1) "electronic cash register," (2) "cash registration," (3) "first means for setting data relating to a sum payable" and (4) "means for transmitting."[*] A technology tutorial, a full round of briefing, and a *Markman* hearing preceded this order.

---

[*] Rather than jointly submitting a list of six disputed claim terms, as requested by the Court, the parties briefed nine disputed phrases before identifying which were to be construed. Verifone later chose five phrases for claim construction, adding "personal data" to the four listed above. Verve separately requested six phrases to be construed, including "second means for setting data relating to an account number of a store" and "credit inquiries." This order construes only the four phrases selected by *both* sides. All other phrases in dispute will be construed by the Court before the case is submitted to the jury for decision.

**STATEMENT**

In this declaratory-judgment action, plaintiff Verifone is the accused infringer. Defendant Verve, LLC is the current assignee of the patents-in-suit. It acquired the '341 patent and the '895 patent (among others) from Omron Corporation and its subsidiaries. The Omron defendants have declined to participate in the claim construction process.

The '341 patent entitled "Electronic Cash Register" was issued on December 31, 1985 (provided as Dukelow Exh. A). The '895 patent entitled "System for Making Payments for Transactions" was issued on July 7, 1987 (provided as Dukelow Exh. B). Although both of these patents have already expired, the question is whether there was any past infringement before expiration, taking into account the six-year statutory period for damages. 35 U.S.C. 286.

The inventions disclosed by the patents sought to improve upon methods of automatically executing payments for credit transactions or inquiring into the credit standing of customers. Previous methods had primarily involved confirmation of a customer's credit standing or credit limit via telephone, a process that increased both the transaction time per customer (resulting in congestion at the payment counter) and the associated clerical work subsequently performed by the bank, credit company or other financial institution.

**ANALYSIS**

Claim construction is a matter of law to be decided by a judge, not a jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). It is well-established that intrinsic evidence (*i.e.*, the claims, the specification and the prosecution history) is the primary source for determining claim meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A patentee acting as lexicographer may create new words, assign specific meanings to existing words or modify a word's ordinary meaning. *Ibid.* An alternative approach suggests that the ordinary and customary meaning of claim terms to persons skilled in the art, which is presumed to govern, should be determined first. *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002). The presumption of ordinary meaning may be rebutted if the patentee "has clearly set forth an explicit definition of the term different from its ordinary meaning" or "has disavowed or disclaimed scope of coverage, by using words or expressions of

2

1   manifest exclusion or restriction." *Ibid.* Under either approach, however, a patentee's own
2   definition of a term will govern. Where an element of a claim is expressed as a means or step
3   for performing a specified function, it will "be construed to cover the corresponding structure,
4   material, or acts described in the specification and equivalents thereof." 35 U.S.C. 112 ¶ 6.
5   　　　In accordance with these generally-accepted principles of claim construction, this order
6   construes four claim terms: (1) "electronic cash register," (2) "cash registration," (3) "first
7   means for setting data relating to a sum payable" and (4) "means for transmitting." The
8   asserted claims of the patents-in-suit (*i.e.*, Claims 1 and 6 of the '341 patent and Claim 12 of the
9   '895 patent) are reproduced below. The disputed phrases construed by this order are italicized.

```
     1.  An electronic cash register comprising:
         a keyboard having keys for cash registration and for
              initiating customer credit inquiries,
         means for performing cash registration processing,
         a card reader for reading data recorded in a customer
              card,
         a communication control unit for communicating
              with a center provided with a customer file having
              stored therein at least data relating to the credit
              standing of a plurality of customers,
         a device for converting data relating to the credit
              standing of a selected customer sent from the cen-
              ter to visible information,
         a memory for storing data as to cash registration and
              data as to credit inquiries, and
         a control unit responsive to keyboard entries for pro-
              cessing cash registration, controlling transmission
              of the data read from the card to the center in a
              credit inquiry message for a selected customer in
              response to a communication start instruction, and
              controlling conversion of credit standing data for a
              selected customer received from the center to visi-
              ble information.

     6.  An electronic cash register as defined in claim 1
         wherein the data relating the credit standing of the
         customer includes data as to whether the card is an
         invalid card, data as to a credit limit and personal data
         as to the customer.

    12.  A system for making payments for transactions
         comprising:
         first means for setting data relating to a sum payable;
         a card reader for reading data from bank cards, each
              having recorded therein at least data relating to the
              account number of the holder of the card;
         second means for setting data relating to an account
              number of a store; and
```

3

> means for communicating with a control center provided with a file having stored therein data relating to the accounts of users and accounts of stores, said control center transferring sums payable from the accounts of users to the accounts of stores, said communicating means comprising *means for transmitting* to the control center data relating at least to the account number of the user, the sum payable and data relating to the account number of the store.

### 1. "electronic cash register"

Verve argues that "electronic cash register" means "an electronic device that allows for cash registration or inputting of a sum to be paid by a customer." Verifone proposes the construction "a device that is capable of recording a cash transaction and of maintaining a cumulative record of a series of cash transactions." This order holds that "electronic cash register" means "an electronic device capable of both calculating a sum to be paid and automatically conducting credit inquiries using data stored on a customer's card." This definition may include a point-of-sale terminal.

The '895 patent, (which was filed before but issued after the '341 patent), describes a system for directly executing credit payments without any intervening clerical work. In short, the invention combines (1) an electronic cash register that calculates the sum of the prices for the goods or services purchased by the customer with (2) a payment-making terminal device that withdraws that sum from the customer's credit account and transfers that value to the store's account. Electronic cash registers are explicitly defined to include "terminals for point-of-sale systems" ('895 Patent at col. 2:14–15). In addition, the specification explains that "[t]he electronic cash register almost always performs the usual register work only, while the payment is executed by the terminal device, so that the register work is separated from the payment process" (*id.* at col. 2:47–50). Thus, the primary function of the electronic cash register is calculating the amount to be paid, as distinguished from executing a payment (*see also id.* at col.1:46–50; col. 3:27–36). Figures 1 and 3 even demonstrate that the electronic cash register and the payment-making terminal device are physically separated in the preferred embodiment.

4

1    The '341 patent further describes the electronic cash register portion of the invention
2    disclosed in the '895 patent. Again, electronic cash registers are defined to explicitly include "a
3    terminal for a point-of-sales system" ('341 Patent at col. 1:49). The specification further
4    explains that an electronic cash register can "automatically check the customer for his credit
5    standing including credit troubles in the past and for the credit limit relative to the expected sum
6    of payment" (*id.* at col. 1:52–55). The preferred embodiment of the patented invention is used
7    by a hotel or motel during check-in to determine whether a particular customer has a sufficient
8    credit limit to cover the expected amount of payment. The individual components of the
9    preferred embodiment are displayed in Figure 2. Where the card is not invalid and the expected
10   payment sum is not in excess of the credit limit, the hotel clerk may allow the guest to check in
11   with a credit card (*id.* at col. 4:41–45). On the other hand, if the credit inquiry returns a
12   negative result (*i.e.*, "the transaction is found unacceptable"), the guest must agree to pay in
13   cash before being allowed to check in (*id.* at col. 5:6–9).

14   Verifone cites this passage as evidence that an electronic cash register must be able to
15   handle a cash transaction. Yet, it should be noted that the guest does not actually pay until he
16   checks *out* of the hotel, for the obvious reason that it is impossible to calculate in advance the
17   total sum that will be incurred during his or her stay. The '341 patent does not describe this
18   subsequent payment transaction. As argued at the hearing, an electronic cash register *could*
19   have this additional functionality — for example, if the electronic cash register was combined
20   with a payment-making terminal in a single device — but the asserted claims do not require an
21   electronic cash register to process payments. In other words, the '341 patent deals exclusively
22   with the *pre-approval* of a customer based on the results of a credit inquiry, rather than the
23   ultimate *payment* of the sum owed.

24   Accordingly, the definition proposed by Verifone is rejected. By referring to cash
25   transactions, Verifone attempts to shift the Court's focus to the ordinary meaning of the phrase
26   "cash register," relying on a dictionary definition to prove its point. During the hearing, one of
27   Verifone's slides even omitted the word "electronic" in quoting the prosecution history,
28   presumably to create the impression that the patentee had distinguished prior art on the basis

5

that it lacked a cash register. *Compare* Dukelow Exh. G at 5 ("In addition, Sendrow does not relate to an electronic cash register but, instead, to a transaction system as noted earlier.") with the Verifone slide, shown below.

> The '341 Patent
>
> **Prosecution History Arguments**
>
> - Omron argued that Sendrow was distinguished by its lack of a cash register:
>   – "The present invention is directed to an electronic cash register which, in addition to performing typical cash register functions…"
>   – "Sendrow does not relate to a cash register but, instead, to a transaction system."
>       » VeriFone Claim Construction Brief,
>         Exhibit G, p. 5 (Amendment to Patent Application)

Regardless of whether the omission of "electronic" before "cash register" in the last bullet point was intentional, it ignores the patentee's own definition of the phrase "electronic cash register" which governs to the extent that there is any deviation from the plain meaning. Indeed, as explained above, the patents-in-suit explicitly distinguish the functions of an electronic cash register from the functions of a payment terminal; only the latter executes payment transactions "so that the register work is separated from the payment process" ('895 Patent at col. 2:47–50).

Verifone's interpretation of the prosecution history is also misplaced. The examiner initially rejected all claims of the '341 patent as unpatentable in light of United States Patent Nos. 4,317,957 ("Sendrow," provided as Dukelow Exh. E) and 4,319,336 ("Anderson") for

1  obviousness under 35 U.S.C. 103 (Dukelow Exh. F at 2). In response, the patentee
2  distinguished both of these references by explaining that Sendrow and Anderson disclosed
3  transaction systems, rather than a system of conducting credit inquiries during a "pre-approval"
4  process. Specifically, the patentee argued that Sendrow taught a method for authenticating
5  users who execute transactions via a cash dispenser or automatic teller machine with a personal
6  identification number (Dukelow Exh. G at 5–6). Thus, the focus of Sendow was the immediate
7  authorization or rejection of the requested transaction at the time funds are transferred.

8  At oral argument, Verifone also argued that the patentee misunderstood what the prior
9  art actually taught about "credit inquiries." Specifically, counsel pointed out that Sendrow did
10 disclose various factors ("if the account balance is adequate, if the transaction requested is valid
11 for the specific account, if the plastic card used to initiate the transaction is not out-of-date, lost
12 or stolen") which are considered, at least by the centralized computer, during the process of
13 determining whether a transaction should be approved (Dukelow Exh. E at col. 42:12-19). As
14 explained on the record, however, this argument is more appropriately raised at a later stage of
15 litigation, when invalidity is at issue. What is or is not actually disclosed by Sendrow (or other
16 prior art) has little to do with the question of how the patentee defined "electronic cash register"
17 or whether this meaning was altered by the statements *about* Sendrow in the prosecution
18 history.

19 On the other hand, Verve's proposed definition is also rejected because it fails to
20 incorporate the additional functionality of automatically making credit inquiries. This function
21 was emphasized both in the specification and in the prosecution history (*see* '341 Patent at
22 col. 1:50–55, Dukelow Exh. G at 5).

23 For the aforementioned reasons, "electronic cash register" is construed to mean "an
24 electronic device capable of both calculating a sum to be paid and automatically conducting
25 credit inquiries using data stored on a customer's card."

26 **2.    "cash registration"**
27 With regard to the phrase "cash registration," Verve proffers the claim construction
28 "entering or providing an amount payable by a customer." Verifone argues that "cash

7

registration" means "making and maintaining a record of the amount of cash received in a cash transaction."  This order adopts a modified form of Verve's construction and holds that "cash registration" means "calculating a sum to be paid by a customer."  This includes both (1) inputting the amount(s) to be paid by a customer for each particular good or service and (2) performing mathematical functions thereon, if necessary.

As explained in the preceding discussion, the electronic cash register has at least two basic functions:  calculating a sum to be paid and automatically conducting credit inquiries using data stored on a customer's card.  Claim 1 of the '341 patent refers to "a keyboard having keys for cash registration and for initiating customer credit inquiries."  The specification also refers to data for cash registration as distinct from data for credit inquiries ('341 Patent at cols. 1:41–42; 2:28–29, 32–33).  "Cash registration" therefore refers to the first function of an electronic cash register, namely calculating a sum to be paid by a customer.

Verifone improperly seeks to impose a limitation concerning cash *payments*.  Yet, as defined above, the electronic cash register described by the '341 patent does not deal with the payment step.  Moreover, Verifone asserts it relies on the plain meaning, yet the only dictionary definition proffered was for "cash register," not "cash registration" (Dukelow Exh. I).  Common sense and everyday experience also dictate that even traditional cash registers are hardly limited to handling transactions only in cash.

As used by the patentee, "cash registration" relates to the process of calculating the total amount to be paid by the customer, regardless of whether this amount will ultimately be paid with credit or cash.  At a minimum, "keys for cash registration" would include keys for numbers, a decimal point, and various functions, such as summing a series of prices or adding sales tax.

    **3.**    **"first means for setting data relating to a sum payable"**

Verve argues that "first means for setting data relating to a sum payable" should be construed as "a means for placing data regarding the sum payable in memory to provide a record of the transaction."  Verifone contends that the proper construction of this phrase is "providing data to the system relating to a sum payable so that the data can be transmitted to the

8

1  control center." This limitation is drafted using means-plus-function language and is thus
2  construed with reference to the corresponding structure, material and acts disclosed in the
3  specification. 35 U.S.C. 112 ¶ 6.
4      Accordingly, this order construes this phrase to cover "a program executed by a central
5  processing unit (CPU) that stores data relating to a sum payable in memory or buffer areas of
6  the electronic cash register or payment-making terminal device and equivalents thereof." These
7  designated memory and buffer areas are described in the specification for the preferred
8  embodiment ('895 Patent at cols. 4:44–5:4).
9      Verve's proposed construction is rejected because it merely rephrases the alleged
10 function and fails to define the "means." Also, its reliance on Figure 8 is inapposite, because
11 the transaction record files are maintained at the control center (*id.* at col. 4:24–33). Claim 12,
12 in contrast, describes a system for making payments for transactions (*i.e.*, the combination of an
13 electronic cash register and a payment-making terminal device, as described above) that
14 communicates with, and is therefore separate from, a control center.
15     Verifone's proffered definition is also rejected as overly vague, with no references to the
16 corresponding disclosures of the specification. This order also rejects Verifone's argument that
17 this phrase must be broadly construed because, as indicated in the prosecution history, Claim 12
18 of the '895 patent was intended to be similar to Claim 10, but "somewhat broader in scope"
19 (Dukelow Exh. J at 4). The analogous limitations in Claim 10 read "means for entering data
20 relating at least to the prices of goods" and "means for calculating the total sum of the prices
21 entered as the sum to be paid." As construed herein, Claim 12 is, in fact, broader in scope than
22 the Claim 10, as the latter requires the presence of means (programs) for performing additional
23 functions — *i.e.*, the storage of data relating to the price of each individual good or service
24 purchased as well as the calculation of the sum of these prices.
25     In summary, this order holds that "first means for setting data relating to a sum payable"
26 includes "a program executed by a central processing unit (CPU) that stores data relating to a
27 sum payable in memory or buffer areas of the electronic cash register or payment-making
28 terminal device and equivalents thereof."

#### 4. "means for transmitting"

As for the phrase "means for transmitting," Verve advocates the construction "a formatted message or data packet including the account number of the user, the sum payable, and the data relating to the account number of the store." Verifone proposes the definition "an electrical line or equivalent structure suitable for transmitting to the control center."

The parties appear to agree that "means for communicating with a control center" refers to a modem or equivalent device. This order agrees that this definition is supported by the specification ('895 Patent at col. 4:12–13). This order construes "means for transmitting" as "the hardware and software components of a modem (or equivalent device) responsible for the sending rather than receiving of formatted messages or data packets and equivalents thereof." The Court explicitly recognizes that in some structural embodiments, the means for transmitting (*i.e.*, sending) may be the same as the means for receiving.

Verve's proffered definition is rejected because the specification describes Figure 9 as an example of "the message to be sent" rather than the means for transmitting such a message (*id.* at col. 5:43–50). Likewise, this order rejects Verifone's proposed construction because it more accurately describes the physical path taken by the transmitted message on its way to the control center, rather than the means for transmitting utilized by the patented invention.

### CONCLUSION

The foregoing claim-construction rulings shall govern all subsequent proceedings herein.

**IT IS SO ORDERED.**

Dated: June 10, 2005



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE